## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

ARCTIC SLOPE REGIONAL CORP.          CIVIL ACTION NO. 07-0476
ASRC ENERGY SERVICES, INC.
OMEGA NATCHIQ, INC.

VS.                                      JUDGE MELANÇON

AFFILIATED FM INS. CO.         MAGISTRATE JUDGE METHVIN

### MEMORANDUM RULING

Before the Court are plaintiffs' Amended Motion for Partial Summary Judgment

[Rec. Docs. 17 & 33] and Memoranda in Support thereof [Rec. Docs. 19 & 34],

defendant's Memorandum in Opposition to Summary Judgment [Rec. Doc. 42], and

plaintiffs' Reply Memorandum to Defendant's Opposition [Rec. Doc. 49].  For the

reasons that follow, plaintiffs' motion for summary judgment will be **DENIED**.

### I.   FACTUAL AND PROCEDURAL HISTORY

On September 24, 2005, Hurricane Rita came ashore just east of the Texas/Louisiana

border between Sabine Pass and Johnson's Bayou.[1]  At the time of landfall, the maximum

sustained winds were 115 miles per hour, making the storm a Category 3 hurricane.[2]  Rita

bought hurricane conditions across southwestern Louisiana and southeastern Texas and

produced rainfall of 5 to 9 inches over large portions of Louisiana, Mississippi, and eastern

---

[1]      National Hurricane Center.  *Hurricane History*, at
http://www.nhc.noaa.gov/HAW2/english/history.shtml

[2]      *Id.*

1

Texas, with isolated amounts of up to 15 inches.[3]  The storm caused devastating storm surge flooding of 10 to 15 feet above normal tide levels along the southwestern coast of Louisiana causing an estimated $10 billion dollars of damage along the Gulf Coast.[4]

One of the many coastal areas devastated by this powerful storm was Iberia Parish, Louisiana.  Omega Natchiq, Inc. ("Omega"), a wholly owned subsidiary of ASRC Energy Services, Inc. ("ASRC-Energy") and Arctic Slope Regional Corporation ("ASRC"), owned an office and construction yard at the Port of Iberia in Iberia Parish. *(Plaintiffs' Amended Memorandum in Support*, pg. 3).  As a result of Rita's storm surge, Omega's facility sustained extensive damage.  (*Id.*)  The plaintiffs, ASRC, ASRC-Energy, and Omega (collectively, "plaintiffs"), were insured by an "all-risks" insurance policy purchased from the defendant, Affiliated FM Insurance Company ("Affiliated" or "defendant").  *Id.*  This policy included several amendments, exclusions, and endorsements that specifically defined the parameters of coverage.

Following the storm, plaintiffs filed a claim for Omega's property damage with Affiliated. (*Exhibit "C," Plaintiffs' Amended Motion for Summary Judgment.*)  Based on the terms of the policy, Affiliated denied the claim.  (*Exhibit "B," Plaintiffs' Amended Motion for Summary Judgment.*)  On September 25, 2006, unable to resolve their dispute with defendant, plaintiffs commenced this litigation in the 19th Judicial District Court for the

---

[3]     *Id.*

[4]     *Id.*

Parish of East Baton Rouge, State of Louisiana [Rec. Doc. 1-2].  On October 20, 2006, defendant timely removed this action to the United States District Court for the Middle District of Louisiana [Rec. Doc. 1] based on diversity jurisdiction.  On October 26, 2006, defendant answered the plaintiffs' complaint and asserted several affirmative defenses [Rec. Doc. 2].  On February 8, 2007, plaintiffs filed their motion for partial summary judgement [Rec. Doc. 17] alleging that the policy provided coverage for the losses sustained.

On March 6, 2007, this case was transferred without objection from the United States District Court for the Middle District of Louisiana to this Court [Rec. Doc. 24]. Subsequently, on March 26, 2007, plaintiffs filed an amended motion for partial summary judgment [Rec. Doc. 33], and on April 13, 2007, defendant filed its opposition [Rec. Doc. 42].  Plaintiffs filed a response to defendant's opposition [Rec. Doc. 49] on May 14, 2007 reasserting their arguments of entitlement to summary judgment.

Plaintiffs move for summary judgment solely on the issue of whether Omega's property damage claim was covered by the "**Wind and/or hail**"[5] definition contained in the policy and do not address whether this is a covered loss under the policy's "**Flood**" provisions. (*Plaintiffs' Amended Memorandum in Support*, pg. 4, FN 5).  Plaintiffs argue that, because the storm surge was "wind driven water," it is a covered peril in the policy and Affiliated erroneously denied coverage.  (*Id* at 5).  Affiliated, conversely, argues that it

---

[5]  Throughout the insurance policy at issue in this case, whenever a specifically defined term is referenced, it is in bold print.  This formatting has been reproduced in this Memorandum Ruling whenever a term, as defined in the policy, is referenced by the Court.

properly denied the claim based on the terms and conditions of the policy including the definition of both "**Wind and/or hail**" and "**Flood**." (*Defendant's Opposition*, pg. 2).

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56;  *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir.1994)(*en banc*).  Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id*.  If the moving party fails to carry this burden, his motion must be denied. If he succeeds, however, the burden shifts to the non-moving party to show that there is a genuine issue for trial.[6] *Id*. at 322-23.  Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts

---

[6]    Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325.  To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the non-moving party of these essential elements renders all other facts immaterial. *Id.* at 322.

sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp.*, 477 U.S. at 324; Fed.R.Civ.Pro. 56(e).  The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986);  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144. 159 (1970); *Little*, 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson*, 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.*, 958 F.2d 95, 97 (5th Cir.1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for.  Fed. R. Civ. P. 56(c) *Celotex Corp.*, 477 U.S. at 322.  Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party.  *Id.*

### III.   LAW AND ANALYSIS

**A.   Applicable law**

Because the Court's jurisdiction in this case is based on diversity, state substantive

law will govern the outcome. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261, 265 (5th Cir. 1997). In determining which state's law should apply, the Court looks to the conflicts of law principles of the forum state - i.e. Louisiana. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, because the policy covered real property situated in Louisiana and the loss occurred in Louisiana, it is undisputed that Louisiana law applies.

Louisiana law defines an insurance policy as a contract between the parties. *Cadwaller v. Allstate Inc. Co.*, 848 So.2d 577, 580 (La. 2003). Accordingly, the general rules for interpreting contracts must be applied in construing the terms of a policy. *Id.* Under the Civil Code, the interpretation of a contract "... is the determination of the common intent of the parties." La. Civ. Code Art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent." La. Civ. Code Art. 2046. "The words of a contract must be given their generally prevailing meaning," and "[w]ords susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code Arts. 2047, 2048.

If an entire provision of a contract is susceptible of different meanings, the provision "... must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." La. Civ. Code Art. 2049. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested

by the contract as a whole."  La. Civ. Code Art. 2050.  This is especially true in

interpreting insurance policies.  The Louisiana Insurance Code, La. Rev. Stat. § 22:1, *et*

*seq*, provides that an insurance policy must be "construed according to the entirety of its

terms and conditions as set forth in the policy, and as amplified, extended, or modified by

any rider, endorsement, or application attached to or made a part of the policy."  La. Rev.

Stat. §  22:654.

　　　When an ambiguity exists, it ". . . must be resolved by construing the policy as a

whole; one policy provision is not to be construed separately at the expense of

disregarding other policy provisions."  *La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.*,

630 So.2d 759, 763 (La. 1994), *citing* La. Civ. Code Art. 2050.  Ambiguity may also be

resolved "... by ascertaining how a reasonable insurance policy purchaser would construe

the clause at the time the insurance contract was entered."  *Id* at 764, *citing Breland v.*

*Schilling*, 550 So2d 609, 610-11 (La. 1989).  "The court should construe the policy 'to

fulfill the reasonable expectations of the parties in light of the customs and usages of the

industry."  *Id., quoting Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 (5th

Cir. 1990).  "If after applying the other general rules of construction an ambiguity

remains, the ambiguous contractual provision is to be construed against the drafter, or, as

originating in the insurance context, in favor of the insured."  *Id.* at 764.

　　　"Under this rule of strict construction, equivocal provisions seeking to narrow an

insurer's obligation are strictly construed against the insurer."  *Cadwaller*, 848 So.2d at

580.  However, "[t]hat strict construction principal ***applies only if the ambiguous policy***

***provision is susceptible to two or more reasonable interpretations***; for the rule of strict

construction to apply, the insurance policy must be not only susceptible to two or more

interpretations, but each of the alternative interpretations must be reasonable." *Id.*

(emphasis added).  Courts should not interpret insurance policies "... in an unreasonable

and strained manner under the guise of contractual interpretation to enlarge or restrict its

provisions beyond what is reasonably contemplated by the parties." *Id.*  In fact, "[c]ourts

lack the authority to alter the terms of insurance contracts under the guise of contractual

interpretation when the policy's provisions are couched in unambiguous terms." *Id.*

"All-risk" policies, like the policy at issue in this case, "create[] a special type of

coverage that extends to risks not usually covered under other insurance; recovery under

an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or

fraud, unless the policy contains a specific provision expressly excluding the loss from

coverage." *Alton Ochsner Mes. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 504 (5th

Cir. 2001), *citing U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 461 (5th Cir.

1982).  Even "all-risk" insurers, however, may limit coverage.  "[A]bsent a conflict with

statutory provisions or public policy, insurers, like other individuals, are entitled to limit

their liability and to impose and to enforce reasonable conditions upon the policy

obligations they contractually assume." *Carbon v. Allstate Ins. Co.*, 719 So.2d 437, 440

(La. 1998).  As previously noted, "exclusionary provisions in insurance contracts are

strictly construed against the insurer, and any ambiguity is construed in favor of the insured."  *Ledbetter v. Concord Gen. Corp.*, 665 So.2d 1166, 1169 (La. 2006).

**B.     Applying the Louisiana rules of interpretation, the loss sustained by plaintiffs was not the result of "Wind and/or hail."**

It is not disputed that the damage to Omega's facility was caused by Hurricane Rita's storm surge.[7]  Rather, the parties dispute what type of coverage applies under the terms of the policy to storm surge related claims.  Plaintiffs allege that, because storm surge is caused by the high winds associated with hurricanes, damage from storm surge is properly classified as "**Wind and/or hail**" damage.  Affiliated, on the other hand, submits that the damage resulting from storm surge is due to the overflow of a body of water onto normally dry lands, and, accordingly, is properly classified as a "**Flood**" under the policy.

The disputed policy provides coverage for "**Wind and/or hail**" damage and "**Flood**" related losses.  "**Wind and/or hail**" and **"Flood"** are specifically defined by the policy and these definitions contain exclusions and amendments that must be considered in determining if a loss is covered.  "**Wind and/or hail**" damage includes:

> . . . direct and/or indirect action of wind and/or hail and all loss or damage resulting therefrom whether caused by wind, by hail or by any other peril other than fire explosion including but not limited to, loss or damage caused when water, in any state, rain, sleet, snow, sand, dust or any other substance, material, object or thing is carried, blown, driven or otherwise

---

[7]     The National Oceanic & Atmospheric Administration, the parent agency of the National Weather Service and the National Hurricane Center, defines "storm surge" as ". . . [a] rise above the normal water level along a shore caused by strong onshore winds and/or reduced atmospheric pressure." National Oceanic & Atmospheric Administration.  *JetStream - An Online School for Weather*, http://www.srh.weather.gov/srh/jetstream/append/glossary_s.htm.

transported by wind onto or into said location.

While, "**Flood**" is defined as:

> . . . any surface water; tidal or seismic sea wave; rising (including overflowing or breaking of boundaries) of any body of water; including but not limited to reservoirs, lakes, streams, rivers, ponds and harbors all whether driven by wind or not, and including spray from any of the foregoing that results from, contributes to, or is aggravated by any of the above.  Flood also includes physical loss or damage from water which backs up through sewers or drains that are below ground level as a result of flood.

In support of their contention that the loss is the result of "**Wind and/or hail**," plaintiffs refer the Court to the policy definition wherein it is stated that ". . . loss or damage caused when water, in any state, [ . . .] is carried, blown, driven or otherwise transported by wind onto or into said location," is covered by the general "all-risk" provisions of the policy.   Read in isolation, this provision would seem to suggest that, because storm surge is, at least in part ". . . caused by strong onshore winds,"[8] coverage may be provided under the "**Wind and/or hail**" definition.  However, this definition cannot be read in isolation.  *See La. Ins. Guar. Assoc.*, 630 So.2d at 763 ("[O]ne policy provision is not to be construed separately at the expense of disregarding other policy provisions.").

When interpreted in light of the other provisions of the policy, as required under Louisiana law, the "**Wind and/or hail**" definition is not as broad as plaintiffs maintain.  Specifically, when read in conjunction with the definition of "**Flood**," it becomes

---

[8]      *Id.*

apparent that storm surge is not encompassed by the definition of "**Wind and/or hail.**"

Rather, as storm surge necessarily involves the ". . . rising (including overflowing or

breaking of boundaries) of [a] body of water,"[9] it is appropriately classified as a "**Flood.**"

The policy's definition of "**Flood**" specifically states that the rising or overflow of a body

of water is considered a flood ". . . whether driven by wind or not."  Hurricane Rita's

storm surge was, in fact, the rising of the Gulf of Mexico, a body of water, that was

driven by wind.  This phenomenon falls squarely within the definition of "**Flood**" and is

properly covered by the limitations set forth in the policy's "**Flood**" coverage.

**C.    Were the Court to accept plaintiffs' argument that storm surge is covered by the definition of "Wind and/or hail," coverage for plaintiffs' loss would nonetheless be excluded.**

*[M]en's lives may depend upon a comma . . . .*[10]

Assuming, *arguendo*, that the "**Wind and/or hail**" definition does encompass

storm surge, recovery is still barred under the unequivocal terms of the policy.  Affiliated

correctly notes that "**Wind and/or hail**" coverage is limited by the "Perils Excluded"

section of the policy.  That section, when read to include the Louisiana Amendatory

Endorsement,[11] provides that:

> This Policy excludes loss or damages if one or more of the following
> exclusions apply to the loss, regardless of other causes or events that
> contribute to or aggravate the loss, whether such causes or events act to

---

[9]    *See Footnote 7, supra.*

[10]   *United States v. Palmer*, 16 U.S. 610, 636 (1818) (Johnson, J. dissenting).

[11]   *Exhibit "A," Plaintiffs' Amended Motion for Summary Judgment,* Tab 7.

produce the loss before, at the same time as, or after the excluded causes or events.

[ . . . ]

8.     **Flood**, Seepage or Influx of water from natural underground sources below the surface of the ground.  Except as provided in Section C., Additional Coverage, Item 2. **Flood**.[12]

---

12      Section C., Additional Coverage, Item 2. Flood, provides:

> a.      This policy is extended to cover direct physical loss or damage to insured property caused by or resulting from **flood**.
>
> This policy does not pay for **flood** commencing before the effective or after the expiration date and time of this policy.  Liability for such loss or damage by **flood** will not exceed the annual aggregate sub-limit as specified in the declarations section in any one policy year.
>
> b.      This coverage does not apply to:
> 1)      Unnamed locations; and
> 2)      Errors and omissions.
>
> Coverage provided by this extension is limited to property within: the fifty (50) United States; District of Columbia; Commonwealth of Puerto Rico; U.S. Virgin Island; and Canada.
> (*Exhibit "A," Plaintiffs' Amended Motion for Summary Judgment*, Tab 4, pg. 3.)

This coverage is limited by Section H of the "Declarations" portion of the policy.  Section H provides:

> 1.      **Flood Exclusion**
>
> Coverage as provided by Section C., Additional Coverage, Item 2. Flood; is excluded at any location situated in:
>
> 1.      Any flood zone or area designated by the Federal Emergency Management Agency (FEMA) as subject to a flood frequency up to and including the 100 year frequency, or
>
> 2.      Any flood zone or area for which FEMA has not yet determined the flood hazard frequency or has not yet classified or designated as being in or out of a flood zone, or any area outside the United States.
>
> The peril of flood is covered in an area protected by dams, levees, dikes, or walls which:
>
> a.      Protect such areas from at least the level of the 100 year flood, and have no such openings or flood gates, and

Plaintiffs claim that this provision is extremely narrow and can only logically be read as excluding a "**Flood**. . . from natural underground sources below the surface of the ground." Defendant argues, however, that this term should be read to exclude both a "**Flood**" and "Seepage or Influx of water from natural underground sources below the surface of the ground."

The "life" of each parties' argument depends on a single comma.  A comma is "... used to indicate a separation of ideas or of elements within the structure of a sentence [or] a pause or separation."  comma. (n.d.). *American Heritage Dictionary of the English Language* (3rd ed. 1996).  Generally, in a series of three or more terms, a comma is placed after each individual term in the series with the exception of the last one.  William Strunk, Jr. & E. B. White, *Elements of Style* pg.2 (4th ed., Allyn & Bacon 2000).   The disputed provision in this case contains a comma after the term "**Flood**" but not after the term "Seepage."  Grammatically, if the phrase " . . . from natural underground sources below the surface of the ground" was intended to modify all three terms in the exclusion, a comma would have been appropriate after both "**Flood**" and "Seepage."  Because there is no comma after "Seepage," the comma after "**Flood**" ". . . indicates a separation of ideas"

---

b.      Were built by and are either maintained or inspected by the United
        States (U.S.) Army Corps of Engineers.

Affiliated FM will not undertake any duty to advise the insured on whether any
locations are in an area excluded from coverage under the Flood Endorsement.
The Insured has the responsibility to determine whether its locations are in an
excluded area.
(*Exhibit "A," Plaintiffs' Amended Motion for Summary Judgment*, Tab 2, pg. 4.)

The issue of whether the disputed policy provides coverage for plaintiffs' loss under its "**Flood**"
provisions is not before the Court.  Thus, this Memorandum Ruling **does not** address this issue.

within the exclusion and isolates that term from the prepositional phrase.  Thus, based on the structure of the phrase, the only reasonable interpretation excludes damage from both "**Flood**," as defined in the policy, and, separately, "Seepage or Influx of water from natural underground sources below the surface of the ground."

Elsewhere in the policy, when a phase is intended to modify more than one item in a series, each of the items is separated by a comma.  In Section F(2)(b), the policy excludes "Discharge, explosion, or use of any nuclear device, weapon, or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war, and regardless of who commits the act." (*Exhibit "A," Plaintiffs' Amended Motion for Summary Judgment*).  In interpreting that exclusion, the plaintiffs, in their reply to the defendant's opposition, are correct to note that each of the terms "discharge, explosion, or use" are modified by the phrase "any nuclear weapon, . . . ."  (*Plaintiffs' Reply*, pg. 5).  However, the structure of the disputed exclusion differs from the cited provision because the disputed exclusion does not contain a comma before the third term. The absence of the comma in the disputed provision and the inclusion in the cited provision are consistent with the Court's interpretation of the exclusion.

Plaintiffs also maintain that the other exclusions contained in the "Perils Excluded" section of the policy ". . . are not based on common events but, rather, are highly unusual events like nuclear explosions, hostile or warlike action, terrorism, and similar risks," and thus, the "**Flood**" exclusion was meant to be extremely narrow and only apply to the highly unlikely event of a "**Flood**" resulting from natural underground

waters.  (*Plaintiffs' Amended Memorandum in Support*, pg. 15).  While it is true that these

rare events are also excluded in the same section as "**Flood**," the plaintiffs fail to note that

other, much more common, perils are also listed in this same section.  These perils

include misappropriation, conversion, any dishonest act, loss or shortage of inventory,

and lack of power or other incoming service supplied from another location.  Plaintiffs

argument fails as these other excluded events are as common or, in most cases, more

common than a "**Flood**," whether resulting from "natural underground sources" or not.

Because storm surge is properly classified as a "**Flood**," the provision cited by

Affiliated excludes the damages plaintiffs sustained as a result of Hurricane Rita except

as specifically provided in the "**Flood**" coverage contained in the policy.  The United

States Fifth Circuit Court of Appeals recently addressed a situation similar to this case

and came to the same conclusion.  In *In Re: Katrina Canal Breaches Litigation*, _____

F.3d _____, 2007 WL 2200004 (5th Cir. 8/2/2007), the plaintiffs were several groups of

insureds who argued that, despite flood exclusion provisions, their "all-risk" insurance

policies covered losses resulting from overtopped and breached levees during Hurricane

Katrina.  They argued that the flood exclusions in the policies were not applicable

because the damages sustained were the result of negligent maintenance of the levees and

not a natural flood.  The Court, in rejecting these arguments, found that it was patently

obvious that what happened in the wake of Hurricane Katrina was a flood.  *In Re:*

*Katrina*, 2007 WL 2200004, at *23.  "Given the generally prevailing use of the term

'flood,' [ . . . ] a reasonable policyholder would expect a massive inundation of water

15

from a breached levee to be excluded, notwithstanding the all-risk nature of the policies."
*Id.*

The same is true here.  As in *In Re: Katrina*, the "generally prevailing use of the term 'flood'" properly describes the cause of the damages in this case.  Further, the policy in this case specifically defines "**Flood**," and includes the ". . . rising (including overflowing or breaking of boundaries) of any body of water; [ . . . ] whether driven by wind or not."  As previously noted, Hurricane Rita's storm surge involved the rising of the Gulf of Mexico.  Because this situation fits squarely within the definition of "**Flood**," it is excluded from the general "all-risk" provisions of the policy including "**Wind and/or hail**" coverage.[13]

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' Motion for Partial Summary Judgment as amended will be **DENIED**.

---

[13]     In addition to the Fifth Circuit, other district courts, when faced with similar arguments, have also come to the same conclusion.  *See Bilbe v. Belsom*, 2007 WL 2042437 (E.D.La. 07/12/2007) (Barbier, J.) (Granting insurer's Motion for Summary Judgment and holding that "storm surge" damage is properly excluded by a provision excluding "flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, or spray from any of these, all whether driven by wind or not."); *Leonard v. Nationwide Mut. Ins. Co.*, 438 F.Supp.2d 684 (S.D. Miss. 2006) (Senter, Senior J.) (Ruling that storm surge was not covered by the "Windstorm or Hail" provision of an insurance contract).